# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-DR-01161-SCT

*JEFFREY KEITH HAVARD*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/19/2002 |
| TRIAL JUDGE: | HON. FORREST A. JOHNSON, JR. |
| COURT FROM WHICH APPEALED: | ADAMS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MISSISSIPPI OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: ROBERT M. RYAN |
| | THOMAS C. LEVIDIOTIS |
| | LOUWLYNN VANZETTA WILLIAMS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: PAT McNAMARA |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | RONNIE LEE HARPER |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | PETITION FOR POST-CONVICTION RELIEF DENIED - 05/22/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     Jeffrey Keith Havard was found guilty of capital murder (murder during the commission of sexual battery) of six-month-old Chloe Britt.  The same jury also found that Havard should suffer the penalty of death. Consistent with the jury verdict, the Adams

1

County Circuit Court imposed the death sentence upon Havard. His conviction and sentence were affirmed by this Court on direct appeal. ***Havard v. State***, 928 So. 2d 771 (Miss. 2006). Havard's motion for rehearing subsequently was denied. Today's case concerns Havard's Application For Leave to Proceed in the Trial Court and Motion for Other Relief filed pursuant to the Mississippi Uniform Post-Conviction Collateral Relief Act, and more specifically, Mississippi Code Annotated Section 99-39-27 (Rev. 2007). Finding no merit in Havard's claims, we deny his request for post-conviction relief.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT[1]

¶2.     In early 2002, Havard was living in Adams County with his girlfriend, Rebecca Britt (Britt), the mother of the victim, six-month-old Chloe Britt. Havard was not Chloe's father. Havard and Britt had been dating for a few months when Britt and Chloe moved in with Havard.

¶3.     On February 21, 2002, at approximately 8:00 p.m., Havard gave Britt some money and asked her to get supper from the grocery store. When Britt returned home, she found that Chloe had been bathed and was asleep. Havard told Britt he had given Chloe her bath and put her to bed. Havard had also stripped the sheets off the bed and told Britt he was washing them. According to Britt, before that night, Havard had never bathed Chloe or changed her diaper. Britt checked on Chloe and she appeared fine. Havard then insisted that Britt go back out to the video store to rent some movies. When Britt returned, Havard was in the

---

[1]We glean the relevant facts from our decision in Havard's direct appeal. ***Havard v. State***, 928 So. 2d 771, 778-79 (Miss. 2006).

2

bathroom with the door shut. Britt went to check on Chloe and discovered that Chloe was blue and no longer breathing. Britt attempted to resuscitate Chloe by CPR before Britt and Havard drove Chloe to Natchez Community Hospital, where Britt's mother worked. The child was pronounced dead at the hospital later that night.

¶4. The pathologist who prepared Chloe's autopsy report testified at trial that some of Chloe's injuries were consistent with penetration of the rectum with an object. Chloe's other injuries included abrasions and bruises inside her mouth. The baby also had internal bleeding inside her skull that was consistent with shaken baby syndrome. Chloe had anal injuries that were observed by both the hospital staff and the sheriff. No one at Chloe's daycare center had ever noticed bruises or marks on Chloe. No anal injuries or anything unusual about the child's rectum was noticed by the daycare staff earlier on the day of Chloe's death.

¶5. Havard was later charged with capital murder with sexual battery being the underlying felony. Two days after Chloe's death, Havard gave a videotaped statement in which he denied committing sexual battery on Chloe. Havard claimed that he accidentally dropped Chloe against the commode after giving her a bath, shook her in a panic, and then rubbed her down with lavender lotion before putting her to bed.

¶6. DNA evidence collected from the bed sheets matched the DNA of both Havard and Chloe. A sexual assault kit testing for any of Havard's DNA in Chloe's rectum or vagina produced negative results. The only explanation offered by Havard regarding Chloe's injuries was that he possibly wiped her down too vigorously when preparing her for bed. Havard was indigent and had appointed counsel at trial and on direct appeal.

3

**SUMMARY OF ISSUES**

I.      Ineffective assistance of counsel for failure to adopt defense strategy during guilt phase.
*A)      Failure to obtain DNA evidence.*
*B)      Failure to secure a pathologist.*
*C)      Failure to include a lesser-offense instruction.*

II.     Ineffective assistance of counsel for failure to investigate, develop and present mitigation evidence during penalty phase.

III.    Ineffective assistance of counsel for failing to develop and present compelling evidence of Havard's childhood and family life in mitigation of punishment.

IV.     Ineffective assistance of counsel for failing to develop and introduce Havard's successful adaptation at Camp Shelby as mitigating evidence during the penalty phase.

V.      Ineffective assistance of counsel for failing to ask potential jurors "reverse-*Witherspoon*" questions during voir dire.

VI.     Ineffective assistance of counsel during closing argument at the penalty phase.

VII.    Prosecutorial misconduct during closing argument at the guilt phase.

VIII.   Victim impact testimony.

IX.     Whether the trial court improperly responded to a question from the jury during the sentencing phase.

X.      Limiting instruction of especially heinous, atrocious, or cruel aggravating circumstance.

XI.     Failure of the indictment to charge a death-penalty-eligible offense.

XII.    Jury consideration of aggravating circumstances.

XIII.   Competency of trial counsel.

XIV.    Cumulative error.

4

## DISCUSSION

### I. Ineffective assistance of counsel for failure to adopt defense strategy during guilt phase.

¶7. Havard asserts the following three sub-claims of ineffective assistance of counsel: (A) trial counsel failed to secure expert assistance to develop evidence to support the defense's theory of the case; (B) trial counsel failed to research case law supporting their defense theory in order to obtain relief during trial in the form of an appropriate expert witness and/or preserve the trial court's denial of an expert for direct appeal; and (C) trial counsel, having adopted the theory that no sexual battery occurred, failed to seek a jury instruction to support the theory. On direct appeal, Havard claimed that he received ineffective assistance of counsel due to counsels' failure to adequately support the defense strategy. Havard also raised the three sub-claims listed above.

¶8. The theory of defense was that no sexual battery occurred, thereby eliminating the underlying felony to the capital murder charge. If this defense had proved successful, Havard would have avoided the death penalty. On direct appeal, Havard argued that trial counsel should have presented rebuttal evidence, and he relied on the post-trial affidavit of Dr. James Lauridson to offer the possibility of disproving, through the use of DNA testing, the state's theory that sexual battery had occurred. *See Havard v. State*, 928 So. 2d 771, 787-88 (Miss. 2006). Havard also claimed that trial counsel was ineffective for failing to secure, or adequately prepare a motion to secure, a pathologist to investigate the case and develop

5

a defense strategy; and that his counsel was ineffective for failing to include a lesser-offense instruction on murder or manslaughter. *Id.* at 788-91.

¶9.     When addressing these issues on direct appeal, this Court determined that it would not consider Dr. Lauridson's outside-the-record affidavit. *Id.* at 787-88 n.6.    The state now argues that Havard is attempting to relitigate the claims already presented on direct appeal and that the issue is barred from post-conviction proceedings by the doctrine of *res judicata* pursuant to Mississippi Code Annotated Section 99-39-21(3) (Rev. 2007).  *See also Wiley v. State*, 750 So. 2d 1193, 1200 (Miss. 1999); *Foster v. State*, 687 So. 2d 1124, 1129 (Miss. 1996); *Wiley v. State,* 517 So. 2d 1373, 1377 (Miss. 1987).

¶10.    As we explained more fully in Havard's direct appeal, the version of Mississippi Rule of Appellate Procedure 22(b) effective at the time of Havard's direct appeal, like the current version, stated:

> **(b) Post-conviction issues raised on direct appeal.** Issues which may be raised in post-conviction proceedings may also be raised on direct appeal *if such issues are based on facts fully apparent from the record*. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute a waiver barring consideration of the issues in post-conviction proceedings.

Mississippi Rule of Appellate Procedure 22(b) (2005) (emphasis added).  *Havard*, 928 So. 2d at 783.  However, as we noted in *Havard*, the version of Rule 22(b) in effect at the time of Havard's trial did not contain the words that appear in italics above. *Id.* n.5.  The amendment adding the italicized words to Rule 22(b) took effect February 10, 2005.  The

Court agreed with Havard that the prior version was controlling on direct appeal. After a

thorough analysis, we determined that

> [i]t would indeed be dangerous here for us to begin a precedent of considering
> on direct appeals post-trial affidavits by affiants who have not been subjected
> to cross-examination. The utilization of affidavits is better served in the post-
> conviction relief proceedings allowable by statute. Miss. Code Ann. § 99-39-1
> et seq. (Rev. 2000). Having raised this issue with different counsel on direct
> appeal, Havard has preserved his right to raise this issue, supported by
> affidavits, in future post-conviction relief proceedings.

*Id.* at 786. The Court proceeded to discuss Havard's issues absent certain post-trial

affidavits.

¶11. In considering the issue *sub judice* on direct appeal, the Court stated that, ". . .

consistent with our discussion of Issue II, supra, we consider this issue, absent Dr.

Lauridson's affidavit." *Id.* at 787. The Court then considered this issue on the merits.

Unlike Havard's Issue II as discussed in Havard's direct appeal, this Court did not

specifically state that Havard had preserved his right to raise the instant issue in post-

conviction-relief proceedings. However, the Court's reasoning for preserving Havard's Issue

II on direct appeal for post-conviction proceedings applies to the instant issue.[2]

---

[2]To be abundantly clear, the "Issue II" on direct appeal was whether trial counsel
rendered ineffective assistance by failing to ask "reverse-*Witherspoon*" questions during voir
dire. In our discussion of Issue II, we addressed an "outside-the-record" juror affidavit and
found that "[t]he utilization of affidavits is better served in the post-conviction relief
proceedings allowable by statute." *Havard,* 928 So. 2d at 786 (complete discussion of Issue
II is found as follows: *Havard,* 928 So. 2d at 782-87). However in discussing Issue IV
(whether Havard was denied ineffective assistance of counsel due to trial counsel's failure
to adequately support the defense strategy), we adopted by reference our reasoning set out
in Issue II in determining that Dr. James Lauridson's "outside-the-record" affidavit should
likewise not be considered on direct appeal, but instead was better suited for consideration

¶12.   The only difference in the instant issue as it is presented here in post-conviction proceedings and its presentation on direct appeal is that Dr. Lauridson's affidavits and reports are now properly before the Court.  Therefore, the issue and its sub-issues are considered to determine if the affidavits and reports provide support for Havard's claims, which were previously considered to be without merit.

¶13.   The test for ineffective assistance of counsel is well-settled.  "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In order to prevail on this claim, Havard must demonstrate that his counsels' performance was deficient and that the deficiency prejudiced the defense of the case.  *Id.* at 687.  "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland*, 466 U.S. at 687).

¶14.   Defense counsel is presumed competent. *Washington v. State*, 620 So. 2d 966 (Miss. 1993).  However, even where professional error is shown, a reviewing court must determine whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Mohr v. State*, 584 So. 2d 426, 430

during post-conviction-relief proceedings. *Id.* at 787.

8

(Miss. 1991). When reviewing a case involving the death penalty, the most important inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695. If Havard's post-conviction application fails on either of the *Strickland* prongs, the proceedings end. *Foster v. State*, 687 So. 2d 1124, 1129-30 (Miss. 1996).

### (A)     Failure to obtain DNA evidence.

¶15.   As we already have noted, counsels' theory of defense was that Havard did not commit a sexual battery, and thus he could not be guilty of capital murder. Havard asserts that his trial counsel were ineffective for failing to secure an expert to perform independent DNA analysis to aid in discrediting the state's proof that a sexual battery occurred.

¶16.   Havard starts by pointing out that only one witness was presented by the defense to establish that a rape kit was performed and that samples were taken from Havard. He next points out that, on cross-examination of the state's witness, Mississippi Crime Laboratory Forensic Biologist Amy Winters, defense counsel established that DNA testing could have been performed on the sexual assault kit done on Chloe Britt. Winters testified that she conducted serological analysis of an oral swab, vaginal swab, vulvar swab and rectal swab, each taken from Chloe Britt. The results of Winters's analysis of the swabs were negative. Winters explained that the tests were for the presence of semen and not for DNA. Throughout closing argument, defense counsel made the argument that DNA testing could

9

have been done, and the state's failure to test for DNA was evidence that there was no sexual battery.

¶17.    Havard accuses his defense counsel of being ineffective because they "failed to realize or to act upon clearly established law in this State that gave his client access to 'all these DNA people,' or more precisely to independent DNA evaluation and the services of other expert witnesses at state expense." Havard relies on *Richardson v. State*, 767 So. 2d 195 (Miss. 2000), to support this claim, and he correctly asserts that *Richardson* stands for the proposition that, even where the state does not present DNA results to a jury, a defendant still may have a right to have the evidence tested at state expense. "The fact that the State did not present DNA results before the jury does not deny the defendant the right to have the evidence tested. The defendant should be permitted to inspect tangible evidence that might be used against him or which might be useful in his defense." *Id.* at 199 (citing *Armstrong v. State*, 214 So. 2d 589, 596 (Miss. 1968)). The "determination of whether the State must pay for an expert witness for an indigent defendant must be made on a case by case basis." *Id.* (quoting *Davis v. State*, 374 So. 2d 1293, 1297 (Miss. 1979)). However, Havard's reliance on *Richardson* is misplaced.

¶18.    Even if counsel had successfully procured an independent DNA expert and that expert had testified that Havard's DNA was not present on the rape kit samples taken from Chloe, that does not exonerate Havard of the sexual battery charge, as this Court previously explained on direct appeal. *Havard*, 928 So. 2d at 788. Mississippi Code Annotated Section 97-3-95 defines sexual battery as sexual penetration with a class of victims.    Sexual

10

penetration, as defined by statute, may be by "insertion of any object into the genital or anal opening of another person's body." Miss. Code Ann. § 97-3-97 (Rev. 2006). Therefore, the absence of Havard's DNA does not exclude his use of "any object."

¶19. Dr. Lauridson's affidavit does not lend support to Havard's claim. Dr. Lauridson's affidavit states that it is his opinion that " . . . there is a possibility that Chloe Madison Britt was not sexually assaulted." Nothing in his affidavit is related to the presence or absence of Havard's DNA on the rape kit samples taken from Chloe Britt. As will be discussed more fully *infra*, Dr. Lauridson's report states that no semen was found in samples taken from the victim. This is cumulative of the testimony of Amy Winters. Therefore, for the purposes of Havard's claim that counsel was ineffective for not successfully procuring an expert to independently test for DNA, Dr. Lauridson's affidavit provides no additional support. Havard's claim does not pass the standard set forth in *Strickland* and is without merit.

### (B)  *Failure to secure a pathologist.*

¶20. For purposes of post-conviction relief, Havard again claims that counsel was ineffective in failing to research case law, which he asserts would have insured him an expert witness to aid in his defense. Havard further asserts that counsel failed to preserve this issue for direct appeal. Havard relies on *Harrison v. State*, 635 So. 2d 894, 901 (Miss. 1994) as did this Court on direct appeal. *Havard*, 928 So. 2d at 788-89.

¶21. On direct appeal, Havard claimed that his trial counsel were ineffective for failing to secure a pathologist to investigate the case and develop a defense strategy. It was made clear that a defendant's right to defense funds for obtaining such an expert is conditioned upon a

11

showing of need of the expert in order to prepare a defense and will depend on the facts and circumstances of each case. *Id.* (citing *Harrison,* 635 So. 2d at 901). Havard's trial counsel made the request based on the need for assistance in interpreting the autopsy reports. The trial court denied the request. This Court held that the trial court did not abuse its discretion and that defense counsel's efforts did not rise "to such a level so as to offend *Strickland*." *Havard*, 928 So. 2d at 789.

¶22. Also worth noting is an affidavit from one of Havard's defense attorneys, Gus Sermos, who stated that he believes a pathologist could have assisted with the case but he had no funding for this purpose and did not consult with one. He also stated that he did consult with a registered nurse. Although we in no way through *dicta* intend to suggest that a registered nurse will suffice when a defendant in a criminal case requests a pathologist, we simply note that counsel's consultation with a registered nurse does evidence counsel's diligence when the request for independent pathologist funding was denied.

¶23. The test provided by *Strickland* and its progeny is two-fold. Havard must show that counsels' performance was deficient. *Id*. 466 U.S. at 687. Second, if the first prong is met, Havard must show that counsels' deficient performance was prejudicial to Havard's defense. *Id.* In this post-conviction proceeding, Havard presents the affidavit of Attorney Ross Parker Simons, who stated that he (Simons) has practiced law in Mississippi for more than twenty years with extensive death-penalty experience.[3] Simons stated in his affidavit that he was

---

[3]Simons also stated in his affidavit that he was co-counsel for the defense of Henry Lee Harrison, reported as *Harrison v. State*, 635 So. 2d 894 (Miss. 1994) just cited above.

of the opinion that Havard's counsel were ineffective within the meaning of **Strickland** because they recognized the need for expert assistance with the defense, as evidenced by their request in the trial court, but they failed in their duty to make a proper showing of need to the trial court. Because of this, Simons further opines that Havard's trial counsel failed to secure an expert or make an adequate record to preserve this issue on appeal.

¶24. As previously stated, this Court considered this issue on the merits, in depth, on direct appeal. We decided that the trial court did not abuse its discretion by denying the defense's request for an independent expert. **Havard**, 928 So. 2d at 788-89. This Court decided that Havard's trial counsel were not ineffective. With all due respect, the affidavit of Simons amounts to nothing more than his legal opinion, and this Court will not substitute Simons's opinion for its own simply because Simons respectfully disagrees with this Court concerning our **Strickland** analysis based on the record with which we are presented. Havard's contention that trial counsel failed to preserve this issue for direct appeal is without merit because this matter was raised and discussed on direct appeal.

¶25. Havard has failed to meet the burden of **Strickland's** first prong, thus, the issue is without merit, and the Court is not required to proceed to the second prong. **Foster v. State**, 687 So. 2d 1124, 1129-30 (Miss. 1996).

¶26. However, assuming *arguendo* that Havard did prevail on the first prong by showing that counsel's performance was deficient, he is unable to show that his defense was

(Havard's Exhibit 16, at ¶ 3).

13

prejudiced. Havard again presents the affidavits and reports of Lauridson, who opined in his affidavit "that there is a *possibility* that Chloe Madison Brit was not sexually assaulted." Taking this statement to its logical conclusion, this leaves open the possibility that she was. Dr. Lauridson's report also is somewhat cumulative when compared with Dr. Steven Hayne's testimony regarding the absence of tearing of the anal sphincter. Dr. Hayne testified as follows:

> Q. [by defense counsel]  If there were any tears down there in your report when you put a contusion of the anus is noted, I presume you would have also written tears were noticed also; is that correct?
>
> A. [by Dr. Hayne] If I had seen them, I would put down laceration.  I did not see it in this case, and I did not exclude it, but I didn't see it.

Dr. Lauridson's report is also cumulative of Amy Winters's testimony that no semen was found on the rape kit swabs taken from the victim.

¶27.    Dr. Lauridson's reports do, however, differ from expert testimony at trial in some instances.  First, Dr. Lauridson asserted that Dr. Hayne was incorrect in his testimony that rigor mortis causes contracture of muscles after death, which Dr. Hayne explained could prevent him from discovering a slight tear.  Dr. Lauridson's indication that Dr. Hayne was incorrect is inconsequential to the point of Dr. Hayne's testimony.  Both doctors agreed that they did not discover a tear.  Dr. Lauridson also belabored the point that Dr. Hayne was incorrect regarding the contracture of the anal sphincter muscle by asserting that photographs of the victim's anus taken in the emergency room compared to photographs taken during autopsy revealed the same amount of anal relaxation.  It is difficult to understand how Dr.

14

Lauridson reached this conclusion, because he admitted that no scales were used in either set of photographs. Further, every doctor and/or nurse present in the emergency room who testified at Havard's trial told the jury that the autopsy photograph of Chloe's relaxed anus did not do justice to the dilated anus they each described as being open about "the size of a quarter." Again, both doctors agreed that there was no tearing of the anus.

¶28. Dr. Lauridson also asserted:

> [e]xperienced medical examiners commonly encounter dilated anal sphincter's [sic] during postmortem examinations. Experience as well as the medical literature recognizes that this finding does not imply anal sexual abuse. Studies of this phenomenon, in fact have shown that children who have died of brain injuries have an increased likelihood of having a dilated anus.

Dr. Lauridson concluded his report stating, "Postmortem anal dilation in infants is a commonly recognized artifact that does not signify sexual abuse." However, as the state points out, Chloe's dilated anal sphincter was discovered while Chloe was in the emergency room and still alive.

¶29. Further, Dr. Lauridson's conclusion was not only contrary to that of Dr. Hayne, it was contrary to the sworn testimony from experienced emergency-room doctors and nurses. Angel Godbold, a registered nurse for eleven years with eight years experience in the emergency room, testified that Chloe's anus was very "unusual" for an infant and the trauma she observed to Chloe's anus led her to later seek counseling. She also described seeing tears. Patricia Murphy, a registered nurse of nearly thirty years, twenty years of which were spent in the emergency room, testified that Chloe's rectum was "not normal by any means," that she had seen sexual trauma before, that she was of the opinion that the injuries sustained

15

by Chloe were the result of sexual trauma, and that it was the worst she had ever seen. Dr. Laurie Patterson, an emergency-room physician who treated Chloe, testified that what she saw of Chloe's anus was not normal and was indicative of sexual penetration. She also testified that she observed a tear of the anus. Dr. Ayesha Dar, Chloe's pediatrician, also tried to save Chloe in the emergency room. She testified that the injury to Chloe's rectum was from sexual abuse consistent with a foreign object being forcibly inserted. Dr. Dar testified that Chloe was bleeding from the anus and she observed a tear. Reverend James E. Lee, the duly elected Adams County coroner, testified that he observed Chloe and noticed something was terribly wrong. He stated that it appeared that something had penetrated the baby's anus.

¶30. Additionally, Dr. Hayne testified that there was a contusion in the victim's rectum measuring approximately one inch. Dr. Hayne further testified that the contusion "would be consistent with penetration of the rectum with an object. . . ." Dr. Lauridson stated that "[t]he lining of the anus and rectum is a delicate tissue and can easily be injured, producing a contusion if a foreign object is inserted." He then reminded this Court that a thermometer was inserted during resuscitation. He offered this for the explanation of why Dr. Hayne discovered a contusion during the autopsy, yet Dr. Lauridson disagreed in his next report that there was a contusion. "There is no histologic evidence for *contusion*, or laceration of the surfaces of the anal perianal or colonic tissues."

¶31. Again, assuming *arguendo* that Havard's counsel was deficient, Havard has not met the second prong of **Strickland** in that Dr. Lauridson's reports and affidavits do not contain evidence that would create a reasonable probability that, but for counsel's deficient

16

performance, the outcome of Havard's trial would have been different. Havard's claim thus does not pass the standard set forth in *Strickland.* This issue is without merit.

### *(C)     Failure to include a lesser-offense instruction.*

¶32.    Havard asserts that his trial counsel were ineffective for failing to include a lesser-offense instruction. This issue was raised and fully addressed in depth on the merits. *See Havard*, 928 So. 2d at 789-91. This claim was clearly discernable from the record before the Court on direct appeal, and Havard did not offer outside-the-record evidence as he did on the other two previously discussed subissues. Further, Havard does not present anything other than the record that was before us on direct appeal. Therefore, unlike the other issues found to be preserved for post-conviction proceedings, this sub-issue is procedurally barred by the doctrine of res judicata. Miss. Code Ann. § 99-39-21(3) (Rev. 2007).

¶33.    In *Lockett v. State*, 614 So. 2d 888 (Miss. 1992), this Court considered the post-conviction application of Carl Daniel Lockett, who like Havard, was convicted of capital murder and sentenced to death. When asked to reconsider issues that were discussed on direct appeal, this Court stated:

> The procedural bars of waiver, different theories, and *res judicata* and the exception thereto as defined in Miss. Code Ann. § 99-39-21(1-5) are applicable in death penalty PCR Applications. *Irving v. State*, 498 So. 2d 305 (Miss. 1986); *Evans v. State*, 485 So. 2d 276 (Miss. 1986). Rephrasing direct appeal issues for post-conviction purposes will not defeat the procedural bar of *res judicata*. *Irving v. State*, 498 So. 2d 305 (Miss. 1986); *Rideout v. State*, 496 So. 2d 667 (Miss. 1986); *Gilliard v. State*, 446 So. 2d 590 (Miss. 1984). The Petitioner carries the burden of demonstrating that his claim is not procedurally barred. Miss. Code Ann. § 99-39-21(6) (Supp. 1991); *Cabello v. State*, 524 So. 2d 313, 320 (Miss. 1988). However, 'an alleged error should be reviewed, in spite of any procedural bar, only where the claim is so novel that

17

it has not previously been litigated, or, perhaps, where an appellate court has suddenly reversed itself on an issue previously thought settled.' ***Irving v. State***, 498 So. 2d 305, 311 (Miss. 1986).

***Lockett***, 614 So. 2d at 893.

¶34.    Havard has not demonstrated a novel claim or a sudden reversal of law relative to this issue which would exempt it from the procedural bar of res judicata pursuant to Mississippi Code Annotated Section 99-39-21(3) (Rev. 2007).  This issue is procedurally barred.

**II.    Ineffective assistance of counsel for failure to investigate, develop and present mitigation evidence during penalty phase.**

**III.    Ineffective assistance of counsel for failing to develop and present compelling evidence of Havard's childhood and family life in mitigation of punishment.**

¶35.    Issues II and III both involve claims of ineffective assistance of counsel arising from the assertion that trial counsel failed to investigate, develop, and present mitigation evidence. Therefore, these issues will be discussed together.

¶36.    On direct appeal, Havard argued that trial counsel were ineffective for not developing and presenting compelling evidence in mitigation of punishment.  In ***Wiggins v. Smith***, 539 U.S. 510, 525, 123 S. Ct. 2527, 2537, 156 L. Ed. 2d 471 (2003), the United States Supreme Court stated that "any reasonably competent attorney" would realize the value in pursuing leads "necessary to making an informed choice among possible defenses." ***Id***.  In what the Court called a "half-hearted" mitigation case, trial counsel in ***Wiggins*** presented one expert witness but did not present the defendant's life history or social details. ***Id***.

18

¶37.	This Court has held that "[i]t is critical that mitigating evidence be presented at capital sentencing proceedings." *Leatherwood v. State*, 473 So. 2d 964, 970 (Miss. 1985). This Court recognized in *State v. Tokman*, 564 So. 2d 1339 (Miss. 1990), that "counsel has a duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." *Id*. at 1342. Additionally,

> [i]n *Stringer v. Jackson*, 862 F.2d 1108, 1116 (5th Cir. 1988), the Fifth Circuit held that "the failure to present a case in mitigation during the sentencing phase of a capital trial is not, per se, ineffective assistance of counsel." We have in the past recognized the *Stringer* rule. *See Gray* [*v. State*], 887 So.2d [158,] at 167 (Miss. 2004). *See also Williams v. State*, 722 So. 2d 447, 450 (Miss. 1998) (citing *Williams v. Cain*, 125 F.3d 269, 277 (5th Cir. 1997)). We have relied on *Stringer* in cases before us on direct appeal. "The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Jones v. State*, 857 So. 2d 740, 745 (Miss. 2003) (life imprisonment sentence following murder conviction). "This court has often upheld decisions not to put on mitigating evidence where the decision resulted from a strategic choice." *Howard v. State*, 853 So. 2d 781, 799 (Miss. 2003) (quoting *Stringer*, 862 F.2d at 1116) (death sentence following capital murder conviction).

*Havard*, 928 So. 2d at 795.

¶38.	Havard submitted several affidavits on direct appeal from friends and family, as well as from a social worker who reviewed Havard's life history. Again, because the former Mississippi Rule of Appellate Procedure 22 was found to be controlling at the time of Havard's direct appeal, this Court considered the issue absent the outside-the-record affidavits, but also held that Havard preserved the issue for post-conviction proceedings. *Id*.

¶39.	In reviewing the issue on direct appeal, the Court ruled adversely to Havard, finding that, "[g]iven the testimony provided in mitigation and what it did show the jury about

19

Havard's life and tendencies, we simply cannot find . . . prejudicial deficiency in trial counsel's performance." *Id.* The Court is now asked to revisit this issue in conjunction with the affidavits of Havard's family, friends, and the social worker.

¶40. Just as on direct appeal, Havard again argues that he received ineffective assistance of counsel because trial counsel called only two witnesses in mitigation, and he alleges that counsel did not prepare the two witnesses for trial or investigate other potential mitigating evidence. The state points out that, during the examination of Cheryl Harrell, she was asked to "describe" her relationship with Havard. She was asked about Havard's relationship with his stepfather, Gordon Harrell. Counsel asked her about Havard's relationship with his biological father. Counsel also asked Harrell to tell the jury why Havard should not receive the death penalty. These open-ended questions allowed the jury to learn that Havard and his mother "have always been close;" that Havard moved in with his grandparents when he was thirteen because of something he had seen happen at school; that Havard visited his mother every chance he got; that Havard was born out of wedlock and that he did not meet his biological father until he was sixteen; and that Havard's father never had a place in his life and never supported him. Cheryl Harrell also described her son as a "kind, tender-loving person" and discussed his love for children. She told the jury about how Havard came to the defense of his niece, a child afflicted with Down's Syndrome, when she was ridiculed by others, and how Havard cared for his younger half-brother when he was young.

¶41. The second mitigation witness called by the defense was Havard's grandmother, Ruby Havard. She was asked similar open-ended questions, and the jury was told about how

Havard allowed Rebecca Britt and Chloe to move in with him; about how hard Havard worked at his job; and about Havard had told her that he planned to ask Rebecca Britt to marry him so that he could take care of her and Chloe. She told the jury that Havard is a loving person and that he loves children. She explained that Havard had two pictures of Chloe in his billfold and how Havard "dearly loved that baby."

¶42.    The state argues that the affidavits are cumulative of testimony the jury heard, and that most of them "contain more damning evidence than praising." In the affidavit of Marilyn Cox, Havard's aunt, she stated that Havard's grandfather, William Havard, used to hit Havard's mother and uncle when they argued with him as children and that William once broke Ruby's nose. Marilyn also concluded that Havard's stepfather, Gordon Harrell, beat Havard because Ruby told Marilyn of bruises found on Havard's body. Marilyn stated that she, too, found bruises on Havard's back and behind. Marilyn never stated that she saw Havard being beaten or that she had any other firsthand knowledge. In the same paragraph in which she concluded that Havard was beaten, Marilyn stated that Cheryl was worried about Havard and agreed that he should go live with his grandparents. Ironically, Cheryl and Ruby, who both testified at trial and now asserted in their affidavits that counsel never interviewed them, did not paint the same picture as Marilyn. Cheryl stated in her affidavit that Havard went to live with his grandparents because of the violence in the schools where he was living. This is consistent with her trial testimony and Ruby's trial testimony. Marilyn's affidavit adds nothing to the testimony heard by the jury except hearsay of Havard's abuse by his stepfather.

21

¶43. William Havard stated in his affidavit that Havard was like a son to him. William stated that he "knew" Gordon was "whipping on" Havard. Again, nothing in the affidavit stated that he ever witnessed these events. He did state that Gordon had a temper and Gordon once kicked in William's front door, forcing William to call the police. William's affidavit then took a turn and negatively described his relationship with Havard. William explained how he bought Havard a truck "so he could get to and from work, but Jeffrey quit as soon as he got it." He stated that Havard caused problems, such as staying out late. Havard would not listen to his grandfather and would get into arguments because Havard did not like being told what to do. In fact, William explained how he sometimes had to call the police to "calm him down." Havard's grandparents had to ask a neighbor to call the police because Havard would not let his grandparents get to their phone. William provided Havard with a trailer up the street. Ruby Havard testified at trial that they provided the trailer, paid the utilities and part of the groceries. William further stated in his affidavit that Havard would have people over using drugs, and that William and Ruby did not approve of Havard's drug activities.

¶44. Daniel Bradshaw, Havard's friend since childhood, went to the Youth Challenge Program at Camp Shelby with Havard. He described how Havard's family did not attend Havard's graduation from Camp Shelby, so Havard went to lunch with Daniel's family. Daniel discussed how Havard came to live with him and his wife, Australia. Daniel trained Havard to work on boats. Daniel stated that Havard started "using a lot of drugs, hanging

22

out with the wrong crowd." Daniel stated that Havard loved children and would take care of their son when Daniel and Australia went out.

¶45.    Australia Bradshaw, also Havard's childhood friend, described how she met Havard at church after he moved in with his grandparents. She described him as "happy go lucky." She corroborated Daniel's affidavit about Havard and Daniel being together at Camp Shelby and how Havard came to live with them when Havard had problems with his grandfather. She described Havard's grandfather getting angry with Havard when Havard stayed out late. She stated that Havard would say "hurtful words to his grandfather." She also witnessed when the police came to the house of Havard's grandfather a couple of times when they "had gotten into it because Jeffrey would race around in his truck and screech his tires." She described Havard and his grandfather as "stubborn." She also told of Havard watching her son.

¶46.    Etta White, Havard's co-worker, described him as "super, he has a great personality and is a good work colleague." She told of Havard stopping by to offer help when he saw Etta out working in the yard.

¶47.    Cheryl Harrell's affidavit restated her trial testimony but also offered new information that she did not tell the jury during Havard's sentencing hearing. She described her father fighting and getting physical with her brothers when they were young, but did not mention that she was beaten as described by Marilyn. Cheryl described her father as thinking that Jeffrey was sent by the Lord to replace her brother after his death, and William brought "lots of gifts when Jeffrey was born." William and Ruby let Cheryl and Jeffrey live with them for

23

a year until Cheryl met her husband, Gordon. Cheryl stated that it was hard raising Havard and he did get "spankings." As previously discussed, she stated that Havard went to live with his grandparents because of the "violence in the schools." When speaking of Havard's grandparents, Cheryl stated, "Jeffrey was always rewarded by them and never punished. He was their favorite, they would do things for him that they wouldn't do for the other grandchildren." Ironically, Cheryl never discussed Havard being abused by his stepfather at trial or in her affidavit. None of the other affiants stated that they witnessed it or that Havard ever told them that he was abused.

¶48. Ruby Havard's affidavit placed blame for Havard's problems with his stepfather, whom she described as having a temper. She stated that Gordon beat Havard, but did not state that she ever witnessed or was told of these beatings. She remembered Havard came to visit once, and he was black and blues with bruises. She then stated that Cheryl was concerned when Havard was growing up because she was worried Havard would start to fight back against Gordon and cause more trouble. Ruby never mentioned any of this at trial. She testified that Havard asked if he could go live with his grandparents because "[h]e liked the schools." In her affidavit, Ruby then described him as dropping out of high school, attending the Youth Challenge Program, and getting his GED. Havard was offered a job as a peer mentor in the program, and William and Ruby bought him a truck so he could travel to his job. She stated that Havard used drugs, and when confronted about it, he "would say ugly things like he wished he had never come to live with us." They never had a chance to punish Havard because he would get in his truck and leave.

24

¶49. Adrian Dorsey Kidd, a social worker who was asked by post-conviction counsel to review Havard's social history record and notes of mitigation interviews with Havard's family and friends, clearly noted that she never personally interviewed Havard or a single family member or friend. Ms. Kidd's affidavit amounted to a compilation of school records, records from the Youth Challenge Program at Camp Shelby, interview notes from those who personally interviewed Havard, affidavits from Havard's family members and friends, interview notes from those who interviewed Havard's family members and friends, Havard's employment records, and incident reports from various sheriffs' departments.

¶50. Ms. Kidd speculated that Havard suffered from a "attachment disorder" and provided a lengthy, general description of the effects of the disorder. Ms. Kidd reached the conclusion that the disorder caused Havard to have problems developing loving and secure attachments. As the state points out, this conclusion is in conflict with the affidavits of family and friends, who described Havard as a loving and good person for whom they would do anything. A review of Ms. Kidd's affidavit reveals a recitation of various records and statements of others amounting to little more than speculation.

¶51. The affidavits presented in this post-conviction proceeding contain information that is cumulative of the testimony given at trial. The statements provided in the affidavits regarding Havard's abuse do not even amount to hearsay. None of the affiants stated that they witnessed any abuse or that Havard ever told them that he had been abused. Havard himself did not mention abuse in his own affidavit. The remainder of the statements in the affidavits reflected negatively on Havard's character. The sum of these affidavits paints a

25

picture of Havard being raised by grandparents who provided opportunities for him, but Havard chose to take drugs, argue and say hurtful things to those who had his best interest at heart – often resulting in law enforcement officials having to be called to calm him down.

¶52.    Havard's counsel are presumed competent. *Washington v. State*, 620 So. 2d 966 (Miss. 1993).   As already noted, the affidavit of Don Evans, an investigator hired to investigate mitigation evidence, is telling of counsels' effort to investigate.  Counsel called two witnesses who gave intelligent and specific mitigation testimony.  Not calling witnesses who will testify negatively for a client or who will testify to matters cumulative in nature is not deficient performance by counsel.    Additionally, even if this Court were to assume *arguendo* that Havard's counsel were deficient, Havard has failed to show that he would have received a different sentence. *Strickland,* 466 U.S. at 687.  "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984) (citing *Strickland*, 466 U.S. at 687).  This issue is without merit.

IV.    **Ineffective assistance of counsel for failing to develop and introduce Havard's successful adaptation at Camp Shelby as mitigating evidence during the penalty phase.**

¶53.    In his next issue, Havard asserts that counsel were ineffective for failing to develop mitigating evidence that Havard applied for and was accepted to the Youth Challenge Program at Camp Shelby.  He offers the affidavit of Daniel Bradshaw, who states that he was a fellow cadet with Havard in the program at Camp Shelby and that Havard thrived in the

26

arduous and highly regimented atmosphere. Havard also offers the affidavit of his grandfather, who stated that Havard was such an exemplary cadet that he was offered a job at Camp Shelby to assist other youths. It is Havard's contention that the adaptability of a capital defendant to an institutional setting is powerful mitigation evidence because it provides a jury with an alternative to the death sentence.

¶54. Havard relies on *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed. 2d 1 (1986). In *Skipper*, the petitioner sought to introduce testimony of two jailers and one "regular visitor" to the jail to show that he had "made a good adjustment" during his time spent in jail. The trial court ruled that under the South Carolina Supreme Court's previous decision in *State v. Koon*, 278 S.C. 528, 298 S.E.2d 769 (1982), such evidence was irrelevant and inadmissible. Skipper was sentenced to death, and he appealed. *Skipper*, 476 U.S. at 3. The Supreme Court of South Carolina rejected Skipper's contention and held that the trial judge properly refused to admit the evidence of his future adaptability to prison life, citing *Koon, supra. Id.*

¶55. The United States Supreme Court granted certiorari to consider Skipper's claim that the South Carolina Supreme Court's ruling was in conflict with prior United States Supreme Court decisions in *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982). *Id.* at 4. *See Skipper v. South Carolina*, 474 U.S. 900, 106 S.Ct. 270, 88 L.Ed.2d 225 (1985).The United States Supreme Court reversed the South Carolina Supreme Court's ruling in *Skipper*, holding that

27

There is no disputing that this Court's decision in *Eddings* requires that in capital cases "'the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings*, supra, at 110 (quoting *Lockett*, *supra*, at 604 (plurality opinion of BURGER, C. J.)) (emphasis in original). Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering "any relevant mitigating evidence." 455 U.S., at 114.

*Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1670-71 (U.S. 1986).

¶56. The issue in *Skipper* and the issue *sub judice* are quite different, because in *Skipper*, the petitioner's counsel attempted to admit the evidence and it was refused. *Id.* at 3. The issue asserted by Havard is whether his counsel were ineffective in failing to develop evidence of his participation in the program at Camp Shelby and present it to the jury.

¶57. The state argues that Havard's reliance on *Skipper* is misplaced and focuses on the dissimilarities between being institutionalized in a prison and the Youth Challenge Program. We find that the state's focus is misplaced. *Skipper* specifically states:

"'[T]he sentencer . . . [may] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings*, supra, at 110 (quoting *Lockett*, supra, at 604 (plurality opinion of BURGER, C. J.)) (emphasis in original).
. . . .
Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering "any relevant mitigating evidence." 455 U.S., at 114.

*Id.* at 4. However, even if this Court were to consider, for the sake of argument, that Havard's counsel were deficient in failing to develop and present this evidence, Havard has not shown that the outcome of his sentence would have been different. Havard must

28

demonstrate that his counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Strickland*, 466 U.S. at 687.

¶58. Havard did not present any affidavits other than those of his family and friends. In *Skipper*, the United States Supreme Court discussed South Carolina's contention that the jailer's testimony would be merely cumulative of the testimony the jury already had heard from the petitioner's family and friends. *Id.,* 476 U.S. at 7-8. The Supreme Court did not accept this argument. In its analysis, the *Skipper* Court stated:

> Finally, the State seems to suggest that exclusion of the proffered testimony was proper because the testimony was merely cumulative of the testimony of petitioner and his former wife that petitioner's behavior in jail awaiting trial was satisfactory, and of petitioner's testimony that, if sentenced to prison rather than to death, he would attempt to use his time productively and would not cause trouble. We think, however, that characterizing the excluded evidence as cumulative and its exclusion as harmless is implausible on the facts before us. *The evidence petitioner was allowed to present on the issue of his conduct in jail was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of more disinterested witnesses -- and, in particular, of jailers who would have had no particular reason to be favorably predisposed toward one of their charges -- would quite naturally be given much greater weight by the jury.*

*Id.* at 8 (emphasis added).

¶59. The affidavits presented by Havard in support of this issue, particularly those of his grandfather, William Havard, and his friend, Daniel Bradshaw, are the kind of evidence the United States Supreme Court described in *Skipper* as "the sort of evidence that a jury naturally would tend to discount as self-serving." For the foregoing reasons, Havard cannot pass the standard set forth in *Strickland*. 466 U.S. at 687. This issue is without merit.

29

**V.   Ineffective assistance of counsel for failing to ask potential jurors "reverse-*Witherspoon*" questions during voir dire.**

¶60.   On direct appeal, Havard argued that his counsel were ineffective by impermissibly failing to ask "reverse-*Witherspoon*" questions, or rather, whether the jurors would automatically vote for the death penalty.  *Irving v. State*, 498 So. 2d 305, 310 (Miss. 1986) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L. Ed. 2d 776 (1968)).  As discussed in Havard's first post-conviction relief issue *supra*, the instant issue was raised by Havard on direct appeal as his Issue II.  The Court refused to consider on direct appeal the affidavit of juror number twenty-nine, Willie Thomas (who was selected as a member of the trial jury as juror number eight in the order of selection).  For reasons previously discussed, this Court held that Havard had preserved the issue for post-conviction proceedings.

¶61.   In addressing this issue on the merits, absent Thomas's affidavit, the Court held:

> Considering the "reverse-*Witherspoon*" issue, absent the juror affidavit, the exact assignment of error here is that defense counsel was ineffective by failing to ask "reverse-*Witherspoon*" questions, meaning defense counsel should have asked whether the jurors would automatically vote for the death penalty. *Irving*, 498 So. 2d at 310. Under this rule, the United States Supreme Court held that a juror must be excused if his or her views on the death penalty would unfairly affect the outcome of the jury verdict. *Witherspoon*, 391 U.S. at 520. Trial counsel did not ask "reverse-*Witherspoon*" questions, but the trial court did. The trial judge asked if any potential juror would automatically vote for the death penalty. Conversely, the judge also asked if any potential juror would automatically vote against the death penalty. The trial court therefore conducted both a "*Witherspoon*" examination and a "reverse-*Witherspoon*" examination. Worth noting is that the trial judge did strike at least nine venire members for cause at the request of the State based on *Witherspoon* considerations. Neither the State nor defense counsel challenged Thomas for cause or peremptorily. The proper questions were asked by the court and counsel and were answered by the potential jurors. The trial judge questioned the jurors on their abilities or inabilities, both as a group and individually, to

30

consider a death sentence. The trial judge also requested that the attorneys not be redundant in their voir dire examination, keeping in mind the voir dire the court had conducted. Honoring this request, defense counsel, during the voir dire, stated to the venire, "I'm not going to ask you anything that the Judge or [counsel for the state] asked you unless we really need to." Again, we cannot find that trial counsel's silence during this phase of voir dire constituted reversible error, when considering the totality of the voir dire examination conducted by the trial judge and the attorneys. Succinctly stated, all necessary questions were propounded to the venire during the whole of voir dire. Defense counsel, having heard the questions and the responses from the venire, and having observed the jurors' demeanor throughout the voir dire, was then free to choose not to repeat the questions. We cannot fairly say defense counsel's performance was deficient and prejudiced the defense. Therefore, this issue fails under the ***Strickland*** test, and is thus without merit.

***Havard***, 928 So. 2d at 786-87. The issue is now before this Court again, along with Thomas's affidavit.

¶62.    Mississippi Rules of Evidence, Rule 606, Competency of Juror as Witness, provides:

**(b) Inquiry Into Validity of Verdict or Indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. *Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.*

(Emphasis added).

¶63.    The affidavit of Willie Thomas does not meet the exception to Rule 606(b), and it should again be excluded from our consideration. Notwithstanding Rule 606(b), Thomas's

31

affidavit does not offer merit to Havard's claim. Paragraphs three and four of Thomas's affidavit stated:

> I believe that the death penalty is the appropriate punishment for Mr. Havard. I think a person should be prepared to give what they take. If you take a life, a life is required.
>
> I think the same punishment should be given to everyone who kills. I felt this way before I served on the jury and I still feel this way today. I would feel this way even if it were my own son on trial. If people knew they would pay with their lives, there would be less killing.

(Havard's Exhibit 15, at ¶¶ 3-4). This affidavit simply shows that Thomas supports the death penalty. Nothing in this affidavit states that Thomas would automatically vote for imposition of the death penalty in every case without first considering the facts of the particular case, including any mitigating circumstances. As the state points out, the question is not whether Thomas believes in the death penalty, but whether he can follow the law. Nothing in the affidavit stated that Thomas would disregard the trial court's instructions and arbitrarily impose the death penalty in every case regardless of the facts. Thomas' affidavit does not add merit to Havard's claim.

¶64. Havard also offers the affidavit of Natman Schaye, whom Havard asserts is a nationally recognized capital litigator. The summation of Mr. Schaye's affidavit is that he is of the opinion that Havard's defense counsel were deficient in failing to ask questions during voir dire to determine the opinions and attitudes of the venire regarding the death penalty. He further believes that Havard was prejudiced by counsel's deficient performance as evidenced by juror Willie Thomas's affidavit.

32

¶65. Our previous discussion *supra* regarding this issue reveals that both **Witherspoon** and "reverse-**Witherspoon**" questions were asked by the trial court. The trial court then instructed counsel for the state and the defense not to repeat questions already asked of the venire panel. This Court concluded that the panel was adequately questioned during the whole of the voir dire examination. Mr. Schaye's affidavit is not persuasive to the contrary. Havard's claim of ineffective assistance of counsel still does not pass the standard set forth in **Strickland**, 466 U.S. at 687. This issue is without merit.

### VI. Ineffective assistance of counsel during closing argument at the penalty phase.

¶66. Havard asserts that he was denied effective assistance of counsel during closing argument of the sentencing phase of the trial. Defense counsel stated, "I mean, it's been obviously documented here that this young child died a tragic death at a very young age of six months. That is an aggravating circumstance, and Mr. Rosenblatt explained that to you." On direct appeal, Havard argued that this his counsel conceded the aggravating circumstance of Chloe's tender age and failed to argue mitigating circumstances. Havard now raises the same arguments via these post-conviction-relief proceedings.

¶67. This issue was presented to this Court on direct appeal and found to be without merit. **Havard**, 928 So. 2d at 798. Therefore, this issue is procedurally barred by the doctrine of res judicata pursuant to Mississippi Code Annotated Section 99-39-21(3) (Rev. 2007),which states: "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal."

33

¶68.   Havard has not demonstrated a novel claim or a sudden reversal of law relative to this issue which would exempt it from the procedural bar of res judicata pursuant to Mississippi Code Annotated Section 99-39-21(3) (Rev. 2007). *See also Lockett v. State*, 614 So. 2d 888 (Miss. 1992) (citing *Rideout v. State*, 496 So. 2d 667 (Miss. 1986); *Gilliard v. State*, 446 So. 2d 590 (Miss. 1984)).

### VII.   Prosecutorial misconduct during closing argument at the guilt phase.

¶69.   During closing arguments, the prosecutor stated, "Now, I'm not making any accusations.  I don't know if anything had ever happened with that child before, but that night he got carried away or something, and he hurt that child more than he intended to in this sexual battery."  Havard argued on direct appeal that the prosecutor's comments suggested to the jury that Havard had previously sexually assaulted Chloe and amounted to prosecutorial misconduct.  This Court noted that defense counsel failed to object and that Havard was not raising the issue under a claim of ineffective assistance of counsel for failing to object.  The Court found the issue to be barred but, nonetheless, discussed the issue on the merits.  This Court held:

> Looking at the record of the entire trial, we cannot find that the actions of the State constituted prosecutorial misconduct.  Additionally, considering the totality of the record, even if we were to somehow find error in these statements, such error was unquestionably harmless.  Lastly, the jury was properly instructed that comments from the attorneys were not to be regarded as evidence when the jury deliberated on its verdict.  Accordingly, this issue is without merit.

*Havard*, 928 So. 2d at 791.

34

¶70. Havard has not demonstrated a novel claim or a sudden reversal of law relative to this issue which would exempt it from the procedural bar of res judicata pursuant to Mississippi Code Annotated Section 99-39-21(3) (Rev. 2007). *See also Lockett v. State*, 614 So. 2d 888, 897 (Miss. 1992) (citing *Rideout v. State*, 496 So. 2d 667 (Miss. 1986); *Gilliard v. State*, 446 So. 2d 590 (Miss. 1984)).

**VIII.  Victim-impact testimony.**

¶71. During the sentencing phase of Havard's trial, the state called Lillian Watson, Chloe's maternal grandmother. Watson testified as follows:

> I am not a vengeful person. My father was a minister and I was always taught an eye for an eye as I know most of you were. I am not here for revenge for [Chloe], but I am here for Justice for [Chloe]. Justice means her life was taken, and there is only one way that we can find justice for [Chloe]. A life for a life.

¶72. Havard asserts that Watson's testimony was highly prejudicial and exceeded the bounds of allowable victim-impact testimony. Again, this Court is presented with an issue on post-conviction relief that clearly was discussed in depth on direct appeal and decided adversely to Havard. *Havard*, 928 So. 2d at 791-93. Today, Havard presents nothing novel in his argument before the Court nor does he argue a sudden reversal in the law related to this issue. The issue is procedurally barred by the doctrine of res judicata. Miss. Code Ann. § 99-39-21(3) (Rev. 2007); *Lockett*, 614 So. 2d at 897.

**IX.  Whether the trial court improperly responded to a question from the jury during the sentencing phase.**

¶73. During jury deliberation at the sentencing phase of Havard's trial, the jury sent a note to the trial judge asking the court to define life without parole and whether the law could be changed to allow parole for Havard in the future. With the agreement of defense counsel and the prosecution, the Court returned a response which stated: " Life without parole means life in prison without eligibility for parole or early release. It would be up to the legislature to make any future changes of the law." *Havard*, 928 So. 2d at 799.

¶74. Just as on direct appeal, Havard now argues that the trial court's response prejudiced the jury by inferring that, if Havard were given a life-without-parole sentence, he could be released in the future. He argues, as before, that the trial court's response to the jury made a life sentence less feasible in the minds of the jurors. Without presenting anything novel to support this claim or a showing of a sudden reversal in the law related to this issue, Havard's claim is procedurally barred. Miss. Code Ann. § 99-39-21(3) (Rev. 2007); *see also* **Lockett v. State**, 614 So. 2d at 897.

> X.    **Limiting instruction of especially heinous, atrocious, or cruel aggravating circumstance.**

¶75. In this claim, Havard asserts that the trial court's limiting instruction of especially heinous, atrocious, or cruel aggravating circumstances violated his constitutional rights because it was unconstitutionally vague. This Court considered this issue on direct appeal, and the decision was adverse to Havard. "This Court has repeatedly held that the 'especially heinous, atrocious or cruel' provision of Mississippi Code Annotated Section 99-19-101(5)(h) is not so vague and overbroad as to violate the United States Constitution." *Havard,* 928 So.

36

2d at 800 (*citing **Stevens v. State***, 806 So. 2d 1031, 1060 (Miss. 2001)). *See also **Crawford v. State***, 716 So. 2d 1028 (Miss. 1998); ***Mhoon v. State***, 464 So. 2d 77 (Miss. 1985); ***Coleman v. State***, 378 So. 2d 640 (Miss. 1979).

¶76. Havard has presenting nothing novel to support this claim nor has he made a showing of a sudden reversal in the law related to this issue. Therefore, Havard's claim is procedurally barred. Miss. Code Ann. § 99-39-21(3) (Rev. 2007). *See also **Lockett***, 614 So. 2d at 897.

**XI. Failure of the indictment to charge a death-penalty-eligible offense.**

¶77. Havard asserts that he has been denied his constitutional rights to notice and jury trial guarantees under the Sixth Amendment to the United States Constitution. This issue was raised on Havard's direct appeal and decided adversely to Havard. ***Havard***, 928 So. 2d at 800-802. Havard has not demonstrated a novel claim or a sudden reversal of law relative to these issues which would exempt a single one of these claims from the procedural bar of res judicata. In fact, Havard again relies on ***Apprendi v. New Jersey***, 530 U.S. 466, 476, 120 S.Ct. 2348, 2355, 147 L.Ed.2d 435 (2000), just as he did on direct appeal. ***Id.*** at 801. This Court previously found the issue to be without merit. The issue is now barred. Miss. Code Ann. § 99-39-21(3) (Rev. 2007); *see also **Lockett***, 614 So. 2d at 897.

**XII. Jury consideration of aggravating circumstances.**

¶78. Havard's entire argument on this issue is restated, verbatim, as follows:

> 277. The trial jury based Mr. Havard's death sentence of [sic] two factors, namely:

(a)   That the capital offense was committed while the defendant was engaged in the commission of, or attempt to commit, sexual battery; and

(b)   The capital offense was especially heinous, atrocious, and cruel.

278.  This finding was erroneous in two ways. First, these two particular aggravating circumstances cannot be submitted where "sexual battery" was an element of the offense. R. 26, 31.

279.  The trial court recognized that [the] "especially heinous" aggravator fully encompassed the "sexual battery" aggravator. Where one aggravator fully subsumes another, they cannot both be submitted to the jury. *Jones v. U.S.*, 527 U.S. 373 (1999) at 399. In weighing states, such as Mississippi, this error demands that the death sentence be vacated. *Stringer v. Black*, 503 U.S. 2002 (1992). Accordingly, Mr. Havard is entitled to relief on this ground.

¶79.  On direct appeal, this Court found Havard's identical issue to be barred because no contemporaneous objection was raised at trial, and Havard did not support his claim with authority. Despite the procedural bars, the Court engaged in a full discussion on the merits of Havard's claim, and found none. This Court found the Tenth Circuit to be helpful due to its abundance of case law surrounding this issue. *Havard*, 928 So. 2d at 802.

"Under our cases, one aggravating circumstance is improperly duplicative of another only if the first aggravator 'necessarily subsumes' the other." *Patton v. Mullin*, 425 F.3d 788, 809 (10th Cir. 2005). "The fact that two aggravating circumstances rely on some of the same evidence does not render them duplicative." *Id.* The concern is that the aggravators are not duplicative. *Id.* When they are not duplicative, the Tenth Circuit allows use of the same evidence to support different aggravators. *Id.* The test for determining when aggravating factors impermissibly overlap and are duplicative is whether one aggravating factor necessarily subsumes the other, not whether certain evidence is relevant to both aggravators. *Fields v. Gibson*, 277 F.3d 1203, 1218-19 (10th Cir. 2002).

*Id.*

38

¶80.    Specifically noteworthy is this Court's holding on direct appeal that:

> [o]f the two aggravators on which Havard focuses, one does not *necessarily subsume* the other.  The jury could have found from the evidence presented at trial that Havard was engaged in the commission of sexual battery while committing the acts on Chloe which led to her death.  Additionally, the jury could have found this crime to meet the [heinous, atrocious, or cruel] standard because of factors other than the sexual battery, such as the relationship between Havard and Chloe's mother or Chloe's age.

*Havard,* 928 So. 2d at 802-03 (emphasis added).  Additionally, in **Loden v. State**, 971 So. 2d 548, 570 (Miss. 2007), this Court held that "[t]he fact that aggravating circumstances share relevant evidence does not make them duplicative.  *See **Jones v. United States***, 527 U.S. 373, 399-400, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999)."

¶81.    It is also worth noting that in **Jones**, on which Havard now relies for his argument before this Court,  the United States Supreme Court stated:

> *We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the "double counting" theory that the Tenth Circuit advanced in **McCullah** and the Fifth Circuit appears to have followed here. What we have said is that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor. See **Stringer v. Black**, 503 U.S. 222, 232, 117 L. Ed. 2d 367, 112 S. Ct. 1130 (1992).*

**Jones v. United States**, 527 U.S. 373, 398 (U.S. 1999) (footnote omitted) (emphasis in original).

¶82.    Because Havard does not present a novel claim or a sudden reversal of relevant law, this issue is barred by res judicata.  Miss. Code Ann. § 99-39-21(3) (Rev. 2007); *see also **Lockett***, 614 So. 2d at 897.

### XIII. Competency of trial counsel.

¶83. In this next issue, Havard asserts that Robert E. Clark, one of Havard's defense attorneys, was incompetent to pursue legal relief on Havard's behalf. It is Havard's further assertion that Clark was intoxicated during Havard's trial, because in a newspaper clipping describing Clark's arrest, the Concordia Parish Sheriff, Randy Maxwell, stated, "We've been working on this a while." Wesley Steckler and Katie Stallcup, *Attorney Arrested on Drug Charges,* The Natchez Democrat, Jan. 16, 2007, at 1A and 3A.

¶84. Ironically, Havard states in his affidavit that he saw Clark use marijuana, ecstacy, and crack-cocaine the first time Havard met Clark around November of 2001. Between that time and the time Clark was appointed as Havard's counsel, Havard states that he went to Clark's home two or three more times to hang out and use drugs. The last time was two weeks before Havard was arrested. By Havard's own admission, he knew and believed his counsel to use drugs. Any concerns Havard may have had regarding his counsel's drug use was certainly capable of being raised at trial or on direct appeal, and the issue is procedurally barred. Miss. Code Ann. § 99-39- 21(1) (Rev. 2007).

¶85. Notwithstanding the procedural bar, Havard's assertion that Clark was intoxicated during his trial is speculation at best and without merit. Havard states in his affidavit that he believes his family told the judge that he was not comfortable having Clark as his attorney "but I don't think they went into great detail as to why I felt that way. I do believe that is why Gus Sermos was appointed to represent me as well. . . ." Havard further states that he was concerned drugs were affecting Clark's performance but did not say anything because

40

he "was in enough trouble with the murder charge and was afraid that admitting I used drugs with Clark, might make my situation worse."

¶86. Havard has presented nothing to this Court thus far that has shown an indicia of unfairness or prejudice at Havard's trial. Additionally, Attorney Gus Sermos also represented Havard at trial. Finally, each and every claim of ineffective assistance of counsel, or otherwise, alleged by Havard on direct appeal and in these post-conviction proceedings, has been found to be without merit. This issue is, likewise, without merit.

### XIV. Cumulative error.

¶87. Havard makes a generic argument that the alleged preceding errors, in the aggregate, fatally compromised his constitutionally protected right to a fair trial. The standard for this Court's review of an appeal from a capital murder conviction and death sentence is clear. Convictions upon indictments for capital murder and sentences of death must be subjected to "heightened scrutiny." *Balfour v. State*, 598 So. 2d 731, 739 (Miss. 1992) (citing *Smith v. State*, 499 So. 2d 750, 756 (Miss. 1986); *West v. State*, 485 So. 2d 681, 685 (Miss. 1985)). Under this standard of review, all doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Id.* (quoting *Irving v. State*, 361 So. 2d 1360, 1363 (Miss. 1978)). *See also Fisher v. State*, 481 So. 2d 203, 211 (Miss. 1985).

¶88. In *Byrom v. State*, 863 So. 2d 836 (Miss. 2003), this Court held:

> What we wish to clarify here today is that upon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-

41

by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect.

*Id.* at 846-47.

¶89.    In the case *sub judice*, the record supports no finding of error, harmless or otherwise,

upon the part of the trial court.  We thus find there is no prejudicial cumulative effect and no

adverse impact upon Havard's constitutional right to fair trial. This issue is without merit.

## CONCLUSION

¶90.    For the reasons stated, Havard's petition for post-conviction relief is denied.

¶91.    **PETITION FOR POST-CONVICTION RELIEF DENIED.**

**SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR.  GRAVES, J., CONCURS IN RESULT ONLY.  DIAZ, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**